UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NORMA MARCELLA, *et al*.                    CIVIL ACTION

VERSUS                                       NO. 24-780

HUNTINGTON INGALLS                           SECTION M (4)
INCORPORATED, *et al*.

### <u>ORDER & REASONS</u>

Before the Court is a motion by plaintiffs Norma Marcella, Scott Marcella, Troy Marcella, and Toni Hebert (collectively, "Plaintiffs") to alter or amend the judgment pursuant to Rule 59 of the Federal Rules of Civil Procedure to include awards of prejudgment and post-judgment interest.[1]  Defendant and third-party plaintiff Huntington Ingalls Incorporated ("Avondale") responds in opposition,[2] and Plaintiffs and Avondale reply in further support of their respective positions.[3]

Also before the Court are Avondale's posttrial motions.[4]  Avondale moves for a judgment notwithstanding the verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure[5] and for a new trial or, alternatively, remittitur pursuant to Rule 59.[6]  Plaintiffs and the third-party defendants[7]

---

[1] R. Doc. 316.
[2] R. Doc. 329.
[3] R. Docs. 331; 343.
[4] R. Docs. 324; 328.
[5] R. Doc. 324.
[6] R. Doc. 328.
[7] The third-party defendants are: (1) Foster Wheeler LLC ("Foster Wheeler"); (2) General Electric Company, now operating as GE Aerospace ("GE"); (3) International Paper Company ("IP"); (4) Paramount Global, f/k/a ViacomCBS Inc., f/k/a CBS Corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation ("Paramount"); (5) Uniroyal Holding Inc. ("Uniroyal"); and (6) Bayer CropScience, Inc, as successor to Rhone-Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company ("Bayer") (collectively, "Third-Party Defendants").

respond in opposition,[8] and Avondale replies in further support of its motions.[9]  Having considered

the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

## I.      BACKGROUND

This is a personal injury case arising from asbestos exposure.  On October 21, 2023, Ronald

Marcella died, and an autopsy later revealed that he had asbestos-related mesothelioma.[10]  His

widow and adult children, Plaintiffs, filed this suit in the Civil District Court for the Parish of

Orleans, State of Louisiana, against Avondale and various other defendants, alleging that Marcella

was occupationally and environmentally exposed to asbestos in the 1960s and 1970s, including

when he worked at Avondale's shipyard as a clerk from May 1962 to May 1964.[11]  Although

Marcella did not directly handle asbestos-containing products at Avondale's shipyard, his work

took him aboard ships and around tradesmen who were cutting block insulation and working with

other asbestos-containing products.[12]  Plaintiffs contend that, in the early 1960s, Avondale was on

notice that asbestos exposure was harmful to employees and that Avondale was negligent for

failing to protect Marcella from, and warn him about, the dangers of asbestos.[13]

On March 27, 2024, Avondale removed this case to federal court on the basis of federal-

officer jurisdiction under 28 U.S.C. § 1442(a)(1), raising a *Boyle* government contractor immunity

defense and a *Yearsley* derivative sovereign immunity defense.[14]  The notice of removal did not

specifically invoke 28 U.S.C. § 1367 as the source of supplemental jurisdiction over Plaintiff's

---

[8] R. Docs. 354; 355; 357; 358; 359; 360.  With respect to Avondale's Rule 50 motion, third-party defendants Foster Wheeler, GE, and Paramount state that they oppose the motion to the extent it seeks a new trial on Avondale's third-party claims.  R. Doc. 360.  Third-party defendant "Bayer takes no position on that motion."  R. Doc. 354 at 2 n.1.

[9] R. Docs. 374; 375.

[10] R. Doc. 2-1 at 3.

[11] *Id.* at 1-4.

[12] Testimony of Melvin Barnewold and Gene Fricke.

[13] R. Doc. 2-1 at 8-22.

[14] R. Doc. 2 at 1, 7-8.

state-law negligence claims.[15]  After removal, Avondale filed third-party demands against various

suppliers and manufacturers of asbestos-containing products that were used at its shipyard during

the relevant time.[16]  Shortly before trial, Plaintiffs filed a motion for partial summary judgment

seeking dismissal of Avondale's *Boyle* and *Yearsley* government-immunity defenses with respect

to their state-law claims which alleged that Avondale (1) failed to warn its employees of the

dangers of asbestos and (2) failed to take precautions to prevent the spread of asbestos dust at the

Avondale shipyard during Marcella's employment and exposure from 1962 to 1964.[17]  The Court

granted the motion.[18]

The case was tried before a jury from February 2, 2026, through February 11, 2026.[19]  At

the time of trial, Plaintiffs' only remaining claim was against Avondale, but Avondale was still

pursuing its third-party claims against the six Third-Party Defendants, as well as seeking to have

two nonparty asbestos manufactures held responsible.  The jury found Avondale negligent and

awarded Plaintiffs $6,625,000 in general damages.[20]  The jury also found in favor of the Third-

Party Defendants and nonparties on Avondale's negligence and strict-liability claims.[21]  The Court

entered judgment in accordance with the jury verdict, but did not mention prejudgment or post-

judgment interest.[22]  The parties then filed the pending posttrial motions.[23]  Specifically, Avondale

moves for judgment notwithstanding the verdict, a new trial, or remittitur.[24]  Plaintiffs move to

alter the judgment to include awards of prejudgment and post-judgment interest.[25]

---

[15] *Id.*
[16] R. Doc. 9.
[17] R. Doc. 107.
[18] R. Doc. 174.
[19] R. Docs. 291; 292; 293; 305; 306; 307; 308; 309; 310.
[20] R. Doc. 311.
[21] *Id.*
[22] R. Doc. 314.
[23] R. Docs. 316; 324; 328.
[24] R. Docs. 324; 328.
[25] R. Doc. 316.

## II.    LAW & ANALYSIS

### A.  Avondale's Motion for Judgment Notwithstanding the Verdict (R. Doc. 324)

At the close of Plaintiffs' evidence at trial, Avondale moved for judgment as a matter of law pursuant to Rule 50(a).[26]  The Court orally denied the motion.[27]  Avondale now renews its motion under Rule 50(b).[28]  Avondale contends that judgment as a matter of law in its favor is warranted because Plaintiffs failed to prove the cause-in-fact and legal cause elements of their negligence claim against Avondale.[29]

In ruling on a Rule 50(b) motion, a "court may: (1) allow judgment on the verdict, if the jury returned a verdict; (b) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).  Judgment as a matter of law on an issue is appropriate when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a).  When evaluating a Rule 50(b) motion, courts "consider all of the evidence drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022) (quotation omitted).  "Thus, a Rule 50 motion must be denied unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (quotation omitted).

### 1.  Cause-in-fact

Avondale argues that, to prove cause-in-fact, Plaintiffs had to show both that Avondale failed to comply with the safety standards in effect at the time of Marcella's employment and that its compliance with those standards would have prevented Marcella from developing

---

[26] R. Doc. 305.
[27] *Id.*
[28] R. Doc. 324.
[29] *Id.*

mesothelioma.[30]  According to Avondale, Plaintiffs failed to demonstrate that Marcella would not have developed mesothelioma if Avondale had followed the asbestos-related safety standards that were in effect in the early 1960s.[31]  Those safety standards allowed significant amounts of daily asbestos exposure.[32]  Thus, says Avondale, even if it had followed those standards, Marcella still may have developed mesothelioma because the evidence at trial showed that there is no safe level of asbestos exposure.[33]  Avondale points out that Plaintiffs' medical causation expert, Dr. Brent Staggs, testified that "[t]here's no known safe level of using asbestos."[34]  Further, continues Avondale, Dr. Staggs, along with Plaintiffs' historian (Gerald Markowitz) and Plaintiffs' industrial hygienist (Jerome Spear), all testified that any amount of asbestos exposure increases the risk of cancer, particularly mesothelioma.[35]  Avondale thus argues that Plaintiffs did not, and cannot, prove that Marcella would not have developed mesothelioma had Avondale complied with the asbestos-related safety regulations of the early 1960s, which allowed for significant exposure.[36]  Indeed, Avondale says that "Plaintiffs effectively argued that compliance with today's standards [the complete elimination of asbestos] – not the standards in 1962 – were the only measure that could have prevented Mr. Marcella's injury."[37]  With that, Avondale argues that no reasonable jury could have found that Avondale's failure to comply with the asbestos regulations in force in the early 1960s was the cause-in-fact of Marcella's injury.[38]

In opposition, Plaintiffs argue that they sued Avondale for negligence, alleging that Avondale breached its duty to provide Marcella with a reasonably safe place to work because, even

---

[30] R. Doc. 324-1 at 1-2, 4-8.
[31] *Id.*
[32] *Id.* at 6-7 (citing trial testimony of Gerald Markowitz).
[33] *Id.* at 8.
[34] *Id.* at 5 (citing trial testimony of Dr. Brett Staggs).
[35] *Id.* at 5-6 (citing trial testimony of Dr. Staggs, Markowitz, and Jerome Spear).
[36] *Id.* at 7-8.
[37] *Id.* at 8.
[38] *Id.*

though Avondale was on notice in the early 1960s that asbestos posed a danger to employees, it "provided no warning and took no protective measures."[39]  Plaintiffs contend that Avondale, in its motion, "overlooks legally sufficient evidence establishing that Avondale's breach of its duty to provide Mr. Marcella a reasonably safe workplace was a substantial factor in causing Mr. Marcella to develop mesothelioma and die."[40]  To that end, Plaintiffs cite: (1) the testimony of Marcella's co-workers, Melvin Barnewold and Gene Fricke, showing that Marcella was exposed to significant levels of asbestos while aboard ships and around tradesmen cutting block insulation; (2) Markowitz's testimony that the minimum standards established by the Walsh-Healey Act in the 1950s and 1960s demonstrate that Avondale, at the relevant time, knew or reasonably should have known about the dangers of exposing its employees to asbestos; (3) the testimony of Brent Levingston, Avondale's industrial hygienist, that the Walsh-Healey Act notified private shipyards, like Avondale, about the dangers of asbestos; (4) the testimony of Avondale's safety-department employee, Pete Territo, along with that of Barnewold and Fricke, showing that Avondale did not warn employees about the dangers of asbestos exposure or otherwise take protective measures, such as performing air sampling or providing respirators; (5) Spear's and Levingston's testimony that Marcella's asbestos exposure was significantly above background levels and increased his risk of developing mesothelioma; and (6) Dr. Staggs's testimony that mesothelioma is a dose-responsive disease and Marcella's significant exposure to asbestos at Avondale was a substantial contributing factor in causing his mesothelioma.[41]  Plaintiffs further argue that Avondale's reframing of the duty owed to be compliance with the standards of the early 1960s is too narrow and contrary to Louisiana law.[42]  Instead, Plaintiffs say that Avondale's duty was to provide a reasonably safe place to work,

---

[39] R. Doc. 357 at 5.
[40] *Id.* at 6.
[41] *Id.* at 6-7, 13-16.
[42] *Id.* at 7, 17-19.

which the jury found it failed to do by not warning Marcella of the known or knowable risks related to asbestos exposure and not providing to Marcella protective measures that could have reduced his exposure and risk of developing mesothelioma.[43]

Avondale replies, arguing that Plaintiffs had no "essential evidence of causation," meaning that Plaintiffs did not show "that any of the measures a reasonably prudent employer in the 1960s should or could have taken – whatever they are – would have prevented Mr. Marcella's injuries."[44] Avondale further argues that Plaintiffs put on a strict-liability case and did not meet their actual burden of proof for negligence.[45] According to Avondale, Plaintiffs proved that the only measure that would have prevented Marcella's disease was eliminating asbestos from the shipyard, which Avondale could not do because its federal contracts required the use of asbestos, and Plaintiffs disclaimed a strict-liability claim to avoid Avondale's federal contractor defenses.[46] Avondale maintains that "[n]ot holding Plaintiffs to task for their failure to establish the essential cause-in-fact element of their deliberately narrow negligence claim amounts to [an] end-run around the immunity conferred on Avondale by the United States Supreme Court precedent against state-law liability based on conduct that contradicts government specifications."[47] Avondale further argues that the jury cannot infer cause-in-fact from evidence that Avondale knew or should have known of the risks of asbestos at the relevant time.[48] Avondale does not dispute that it had a duty to provide a reasonably safe workplace, but contends that Plaintiffs failed to prove what that means for the 1962-1964 timeframe and that Avondale failed to comply.[49]

---

[43] *Id.*
[44] R. Doc. 374 at 2, 4-7 (quote at 2; emphasis omitted).
[45] *Id.*
[46] *Id.* at 5-6.
[47] *Id.* at 6.
[48] *Id.* at 4.
[49] *Id.* at 4-5.

The Court agrees with Plaintiffs that there was sufficient evidence adduced at trial for the jury to reasonably find that Marcella's exposure to asbestos at Avondale was a cause-in-fact of his subsequent injury. "To prevail in an asbestos case a plaintiff must show, by a preponderance of the evidence, he was exposed to asbestos and he received an injury substantially caused by that exposure." *Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1088 (La. 2009), *abrogated on other grounds by Pete v. Boland Marine & Mfg. Co.*, 379 So. 3d 636 (La. 2023). In other words, a plaintiff seeking to recover under a negligence theory "must prove that the [defendant's] negligent act … was a cause-in-fact of the injury." *Id.* "[A] defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." *Id.*

Avondale first attempts to escape liability by reframing its duty from providing a safe workplace to compliance with the asbestos-exposure standards of the 1960s. Avondale cites no asbestos case delineating the latter as the applicable duty. In *Rando* the Louisiana supreme court recognized that employers who used asbestos-containing products had a broader duty – a duty to provide a reasonably safe place for its employees to work. *Id.* at 1086-87. Indeed, if Avondale's theory were correct and the duty of an employer were to comply with the inadequate safety standards of the early 1960s, no asbestos plaintiff exposed during those periods would ever be able to prove negligence. Plaintiffs are not, as Avondale argues, saying that Avondale had to eliminate asbestos. Instead, Plaintiffs' theory is that Avondale had a duty to protect against or mitigate the known or knowable effects of asbestos by warning its workers or providing safety equipment such as respirators, which Avondale failed to do. Moreover, the evidence cited by Plaintiffs demonstrates that the jury could have reasonably found that, in the early 1960s, Avondale knew or reasonably should have known that asbestos was dangerous to its employees. Further, there was no evidence that Avondale took any measures to warn its employees about the health risks posed

8

by asbestos fibers nor that it took protective measures available to it, such as air sampling or providing dust masks to employees. The evidence showed that Marcella contracted mesothelioma (a disease only caused by breathing asbestos fibers), that he was exposed to asbestos at Avondale as an "onlooker," *see id.* at 1088-92, and that Avondale was the only place he was ever exposed to asbestos. Thus, taking this evidence together, the jury could have reasonably found that Avondale breached its duty to provide a safe workplace and that this breach was the cause-in-fact of Marcella's injury.

### 2. Legal cause

Avondale also argues that Plaintiffs failed to prove legal cause because they did not introduce evidence demonstrating that any occupational asbestos-exposure at Avondale's shipyard was sufficient in terms of duration, proximity, and severity to have caused Marcella's mesothelioma.[50] It points out that Plaintiffs' counsel, in order to undermine Avondale's third-party claims, argued that there was no evidence placing Marcella in the vicinity of any specific asbestos-containing product.[51] And consequently, says Avondale, there was no evidence adduced at trial showing that Marcella was exposed to asbestos at Avondale's shipyard of sufficient duration, proximity, and severity to have caused his injury.[52]

In opposition, Plaintiffs again contend that Avondale overlooks the evidence showing that Marcella's non-trivial asbestos exposure was a substantial contributing factor in causing his mesothelioma.[53] Plaintiffs cite: (1) Barnewold's and Fricke's testimony that Marcella was exposed to asbestos while aboard ships; (2) Spear's testimony that the asbestos exposure described by Barnewold and Fricke was above background levels; (3) Levingston's testimony that Marcella was

---

[50] R. Doc. 324-1 at 2, 8-11.
[51] *Id.*
[52] *Id.*
[53] R. Doc. 357 at 8, 19-22.

exposed to significant levels of asbestos at Avondale that increased his risk of developing mesothelioma; and (4) Dr. Staggs's testimony that Marcella's exposure to asbestos at Avondale was a substantial contributing factor in causing his mesothelioma.[54]  Plaintiffs further contend that Avondale's argument is erroneous because they were not required to show that Marcella was exposed to a particular asbestos-containing product, but rather that Avondale breached its duty to provide a reasonably safe workplace.[55]  Plaintiffs say that Avondale is attempting to morph their negligence claim into a products-liability claim.[56]

As to medical causation, Avondale repeats in reply that Plaintiffs failed to prove proximity, duration, and severity because "there was literally no evidence at all placing Mr. Marcella in proximity of asbestos at any point in time."[57]  Avondale acknowledges that there was testimony that Marcella was seen on the gangplank of some vessels, but insists that this is insufficient to prove exposure because "[t]here was no evidence of where he went, how often he went there, how long he stayed, or to what he was or was not exposed."[58]  Avondale points out that Spear testified that he lacked direct evidence that would have allowed him to opine as to which asbestos-containing product or products Marcella was exposed.[59]  And, says Avondale, this missing evidence is necessary to prove Plaintiffs' case.[60]

Again, the Court agrees with Plaintiffs.  Because there is a medically demonstrated causal relationship between asbestos exposure and mesothelioma, "every non-trivial exposure to asbestos contributes to and constitutes a cause of mesothelioma." *McAskill v. Am. Marine Holding Co.*, 9 So. 3d 264, 268 (La. App. 2009) (observing that the legal cause "burden can be met by simply

---

[54] *Id.*
[55] *Id.* at 8-9, 21-22.
[56] *Id.* at 21-22.
[57] R. Doc. 374 at 2-3, 7-9 (quote at 3).
[58] *Id.* at 3, 7-9 (quote at 3).
[59] *Id.* at 8.
[60] *Id.* at 3, 7-9.

showing that [the plaintiff] was actively working with asbestos-containing materials"). Here, the evidence adduced at trial, as described in Plaintiffs' opposition memorandum, was sufficient for the jury to reasonably conclude that, while working at Avondale's shipyard, Marcella was exposed to significant levels of asbestos (above background), which increased his risk of developing mesothelioma. And "[m]edical science has proven a causal relationship between asbestos exposure and mesothelioma above background levels." *Id.* Plaintiffs need not demonstrate that Marcella was exposed to a specific asbestos-containing product, but rather that he was exposed to asbestos, in general, while working at Avondale. Again, based on the evidence introduced at trial, the jury could have reasonably found that he was. Accordingly, Avondale's Rule 50(b) motion is denied.

## B. Avondale's Motion for New Trial or, Alternatively, Remittitur (R. Doc. 328)

Avondale also moves for a new trial or, alternatively, remittitur, pursuant to Rule 59.[61] Avondale argues that it "was irrevocably prejudiced by the coordinated and improper tactics of Plaintiffs and Third-Party Defendants at trial in this case, and the damages award was excessive."[62]

"After a jury trial, Rule 59 of the Federal Rules of Civil Procedure authorizes courts to grant motions for new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Wantou*, 23 F.4th at 431. Those reasons include "if the trial court finds that the verdict is against the weight of evidence; the damages awarded are excessive; the trial was unfair; or prejudicial error was committed." *Adams v. Ethyl Corp.*, 838 F. App'x 822, 827 (5th Cir. 2020). "Notwithstanding the broad sweep of Rule 59, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Gen. Access Sols., Ltd. v. T-Mobile USA, Inc.*, 2026 WL 823162, at *1 (E.D. Tex. Mar. 25,

---

[61] R. Doc. 328.
[62] R. Doc. 328-1 at 1.

11

2026) (quotation omitted).  In other words, "a new trial is warranted only if the opposing party shows that it was sufficiently prejudiced considering all the facts and circumstances of the case." *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 180 (5th Cir. 2005).  Counsels' "improper remarks become the basis for granting a new trial when the trial judge, with the benefit of his or her first hand knowledge of the entire proceedings, believes that the remarks infected the deliberations and conclusions of the jury."  *Guar. Serv. Corp. v. Am. Emps.' Ins. Co.,* 893 F.2d 725, 729 (5th Cir.), *modified on reh'g on other grounds*, 898 F.2d 453 (5th Cir. 1990).

### 1.  Avondale's motion for new trial premised on prejudice

#### a.  Spear's testimony

Avondale argues that it was prejudiced by Plaintiffs' and Third-Party Defendants' trial tactics.[63]  First, Avondale contends that Plaintiffs improperly and materially altered the scope of Spear's testimony on the stand by having him testify that he was not retained to identify the asbestos-containing products to which Marcella was exposed.[64]  Avondale says that these statements contradicted Spear's expert report and deposition testimony wherein he attributed Marcella's asbestos exposure to the Third-Party Defendants' and nonparty-manufacturers' products, particularly those of Johns Manville, Benjamin Foster, Taylor Seidenbach, Foster Wheeler, GE, Westinghouse, and Uniroyal.[65] Avondale claims that it was not permitted to cross-examine Spear on the contradiction after Third-Party Defendants "feigned surprise," but there was no surprise because Spear's deposition testimony attributed Marcella's exposure to their products.[66]  Avondale contends that it was further prejudiced when, "[i]n closing arguments,

---

[63] R. Doc. 328
[64] R. Doc. 328-1 at 1-2, 4, 13-16.
[65] *Id.* at 2, 4-16.
[66] *Id.*

counsel for Plaintiffs and the Third-Party Defendants all highlighted Mr. Spear's purported 'inability' to give product-specific exposure testimony."[67]

In opposition, Plaintiffs argue that "Avondale fails to show how its cross examination of Spear was limited in any prejudicial way" and that "[t]he jury heard about [Spear's] supposed inconsistent testimony and drew its own conclusions."[68]    Plaintiffs also argue that the Court properly exercised discretion in the handling of Avondale's cross-examination of Spear.[69] According to Plaintiffs, Avondale fails to identify a direct contradiction between Spear's trial testimony and his expert report because Spear explained at trial that his report concerns "general asbestos-containing products and exposures at Avondale Shipyard, but is not specific to Mr. Marcella."[70]   Plaintiffs further contend that Avondale was permitted to ask Spear about product-specific asbestos exposure and his purportedly contradictory deposition testimony, and "[e]ach time, as to each manufacturer's product, Mr. Spear gave essentially the same answer: He would agree that occupational exposure to the asbestos-containing product would have significantly increased Mr. Marcella's risk of developing mesothelioma if Mr. Marcella were in close proximity to work being performed using the product.  But Mr. Spear had no direct testimony placing Mr. Marcella in proximity to the particular product."[71]   With that, Plaintiffs assert that there was no ambush and that the Court appropriately limited Spear's testimony to his expert report.[72] Moreover, Plaintiffs point out that Levingston offered product-specific exposure testimony and the jury simply was not persuaded by it.[73]

---

[67] *Id.* at 4-5.

[68] R. Doc. 358 at 5.

[69] *Id.* at 11-13.

[70] *Id.* at 12 (alteration omitted) (quoting Spear's expert report).

[71] *Id.* (footnote omitted).

[72] *Id.* at 12-13.

[73] *Id.* at 13.

Similarly, Third-Party Defendants argue that Avondale was not ambushed by Spear's testimony because his testimony was consistent throughout the litigation – attesting that Marcella was exposed to asbestos-containing products when he worked at Avondale, but Spear could not say with certainty which products Marcella was around in the shipyard.[74]  Indeed, Third-Party Defendants argue that Spear could not have identified the specific products to which Marcella was exposed because there was no direct evidence placing Marcella in the vicinity of any particular asbestos-containing product.[75]  Third-Party Defendants assert that Spear was hired to address asbestos exposure at Avondale generally, not whether a given manufacturer's product increased Marcella's risk of injury.[76]  Nonetheless, say Third-Party Defendants, Avondale was able to cross-examine Spear on product-specific hypotheticals to which he responded that Marcella could potentially have been exposed to those products, but that Spear had not done that analysis.[77]  The Third-Party Defendants also point out that, like Spear, Levingston testified that he had no specific information regarding the particular products to which Marcella was exposed.[78]  In sum, Third-Party Defendants argue that there was no ambush sufficient to justify granting Avondale's motion for a new trial.[79]

Avondale replies, reurging that it was prejudiced because Spear's deposition testimony was not consistent with the testimony he gave at trial and the Court limited its cross-examination and ability to impeach him.[80]  According to Avondale, Spear clearly testified at his deposition that Marcella was exposed to the Third-Party Defendant's products and his reversal at trial was a

---

[74] R. Docs. 354 at 3-6; 359 at 1, 7-8.
[75] R. Docs. 354 at 5-6; 355 at 3-7.
[76] R. Docs. 354 at 6; 355 at 3.
[77] R. Docs. 354 at 6-7; 355 at 6-7; 359 at 1-2.
[78] R. Doc. 355 at 2-3, 7-8.
[79] R. Docs 354 at 7-8
[80] R. Doc. 375 at 1-2.

surprise to Avondale and the Court erred by relying on the misrepresentations of Plaintiffs and Third-Party Defendants regarding the scope of Spear's report and deposition testimony.[81]

The Court agrees with Plaintiffs and Third-Party Defendants. Avondale was not prejudiced by Spear's trial testimony. Spear clearly and consistently testified at his deposition and at trial that he could not, with reasonable certainty, attribute Marcella's injury to any of the Third-Party Defendant's specific products because there was no direct evidence placing Marcella in their vicinity. And Avondale was permitted to cross-examine Spear on hypotheticals regarding whether the injury could be attributed to the Third-Party Defendants' products if there was direct evidence showing that Marcella came in contact with them. Apparently, the jury was not persuaded that such direct evidence had been shown. Also, in closing, Avondale was allowed to argue to the jury that Spear's testimony was impeached, but again, the jury was not convinced. These are not reasons to grant a new trial.

### b. Improper statements

Avondale argues that Plaintiffs and Third-Party Defendants made numerous improper and unduly prejudicial statements to the jury, communicating "anti-corporate bias, wealth of the defendant, opinions of counsel about the evidence, arguments without factual support, incorrect statements about the burden of proof, false statements about Avondale's positions, and wildly inaccurate assertions concerning the evidence of damages in the case."[82] In particular, Avondale takes issue with the fact that counsel for Plaintiffs and the Third-Party Defendants, on numerous occasions, emphasized that Plaintiffs themselves did not sue the Third-Party Defendants and opined that Avondale's claims against the Third-Party Defendants were thus meritless.[83] Avondale

---

[81] *Id.* at 2-4
[82] R. Doc. 328-1 at 2-3, 16-25.
[83] *Id.* at 18-21.

contends that the Court's curative jury instruction on this issue was ineffective because "the prejudice was already done" considering the combined effect of opposing counsels' repeated improper comments.[84]

Next, Avondale argues that it was prejudiced by Plaintiffs' counsel's improper emphasis on the dollar value of Avondale's contracts with the Navy, both when cross-examining Avondale's maritime expert, Christopher Herfel, and in closing arguments.[85]  Avondale argues that the amount of its contracts had no relevance to the case and the statements were prejudicial because they invited the jury to predicate its verdict on Avondale's perceived wealth.[86]  Avondale also contends that it was prejudiced both by Plaintiffs' closing argument urging the jury to hold a big corporation accountable for its actions and claiming that Avondale thought that Marcella was "worthless" because of his comorbidities and by Plaintiffs' opening statement that attempted to place the burden of proof on Avondale.[87]  Further, Avondale cites as prejudicial Foster Wheeler's assertion in closing argument that Marcella was exposed to asbestos at Avondale's shipyard because his office was near the insulation shop, which made asbestos-containing blankets.[88]  Avondale says this statement was improper argument because there was no evidence adduced at trial to support it.[89]  Avondale argues that a new trial is warranted because the repeated improper remarks of counsel for Plaintiffs and Third-Party Defendants, taken together, "crossed the line from oratory and hyperbole to impermissible prejudice."[90]

---

[84] *Id.* at 18.
[85] *Id.* at 21.
[86] *Id.* at 21-22.
[87] *Id.* at 22-23.
[88] *Id.* at 23-24.
[89] *Id.* at 24-25.
[90] *Id.* at 25.

As to the claimed improper remarks, Plaintiffs and Third-Party Defendants argue that Avondale forfeited most of those challenges by failing to make contemporaneous objections.[91] They also contend that, assuming that the remarks were prejudicial and the objections preserved, the Court's jury instructions cured any potential prejudice.[92] Further, the Third-Party Defendants argue that there was no impropriety in their describing the procedural posture of the case – that Plaintiffs did not sue them directly.[93] Finally, Foster Wheeler argues that the theory that Marcella encountered asbestos while working near the insulation shop at Avondale's shipyard was not new and was supported by the evidence, particularly Fricke's testimony regarding the location of Marcella's office.[94]

Avondale replies, arguing that it was not required to make contemporaneous objections to inflammatory statements made during the opposing parties' opening and closing statements in order to seek a new trial based on those grounds.[95] Avondale contends that the sum total of the opposing parties' improper remarks, especially those made in closing arguments, resulted in prejudice that could not have been cured by jury instructions.[96] Avondale also argues that Marcella's office was not near the insulation shop, contrary to Foster Wheeler's assertion.[97]

Pretermitting whether Avondale's objections to the supposedly inflammatory remarks were preserved and whether those remarks were prejudicial, the Court agrees with Plaintiffs and Third-Party Defendants that the curative instructions to the jury eliminated any potential prejudice. The Court instructed the jury that (1) "[t]he testimony of the witnesses and other exhibits introduced by the parties constitute the evidence"; (2) "[t]he statements of counsel, including those

---

[91] R. Docs. 358 at 5, 13-14; 354 at 8-9; 359 at 8-9.
[92] R. Docs. 358 at 5, 11, 14-15; 354 at 9-14; 359 at 9-10.
[93] R. Docs. 354 at 9; 355 at 3-5.
[94] R. Doc. 359 at 11-14.
[95] R. Doc. 375 at 5.
[96] *Id.* at 5-8.
[97] *Id.* at 6.

related to the amount of damages, do not constitute evidence, but are only arguments"; (3) they, as jurors, must "decide this case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to [them] in the courtroom"; (4) they, as jurors, "should not be influenced by passion, prejudice, or sympathy [they] might have for the Plaintiffs or any defendant in arriving at [their] verdict"; and (5) "[a] plaintiff's decision not to pursue claims directly against any third-party defendant is not evidence and may not be considered by [them] when determining whether a case has been proved."[98]  The Court trusts that the jury heeded the curative instructions, along with all of the other instructions, when reaching a verdict, thus minimizing the effect of any improper remarks.  *See Heckman v. Gonzalez-Caballero*, 65 F.4th 222, 228 (5th Cir. 2023) ("As juries are presumed to follow the instructions of the court, we conclude that the trial court's instructions effectively minimized any prejudice flowing from the improper remarks." (quotations and alterations omitted)).  Further, based on Fricke's testimony, it was reasonable for the jury to conclude that Marcella encountered airborne asbestos while working in close proximity to the shipyard's insulation shop.  Thus, a new trial is not warranted based on counsels' claimed improper remarks.

### c.  Plaintiffs' damages request

Avondale argues that a new trial or remittitur is warranted because it was prejudiced by Plaintiffs' closing argument that "mentioned damages that grossly exceeded, by multiple factors, the highest permissible amount for a case of this nature," which led to an excessive general damages award.[99]  In closing argument, Plaintiffs' counsel asked the jury to award $15.5 million, which argument Avondale says was not made in good faith or supported by the law considering

---

[98] R. Doc. 310-2 at 1-2, 6.
[99] R. Doc. 328-1 at 3, 25-28.

the evidence.[100]  The jury awarded $6.625 million, a number that Avondale argues "is grossly disproportionate given the evidence presented at trial of Mr. Marcella's advanced age, underlying health conditions, and limited evidence regarding pain and suffering."[101]  Avondale contends that "Plaintiffs put on scant evidence demonstrating what harm Mr. Marcella actually experienced due to mesothelioma between July and October 2023, [and i]nstead … spoke to the type of person he was and the activities that he enjoyed years before the manifestation of his disease – activities that he had ceased due to his other numerous chronic medical conditions, as well as dementia."[102]  Further, Avondale comments that "[t]he only medical evidence that the jury heard was that Mr. Marcella experienced approximately three months of discomfort and frustration over his disease, conditions that 'came and went' and were not present even a month before his passing."[103]  Thus, Avondale contends that the verdict was "vastly higher than the highest reasonable amount a jury could have awarded based on this evidence," demonstrating that "the jury was improperly influenced by passion and prejudice."[104]  According to Avondale, the excessive award warrants a new trial.[105]

Avondale replies that neither Plaintiffs nor any Third-Party Defendant specifically responded to the portion of Avondale's motion seeking a new trial based on Plaintiffs' damages request.[106]  Instead, says Avondale, Plaintiffs focus on trying to show that this case is similar to *Pete v. Boland Marine & Manufacturing Co.* in an effort to stave off remittitur.[107]  The Court recognizes that Plaintiffs' counsel suggested to the jury a very high damages award.  Because the

---

[100] *Id.*
[101] *Id.* at 25-26.
[102] *Id.* at 3.
[103] *Id.*
[104] *Id.* at 3-4, 26.
[105] *Id.* at 25-28.
[106] R. Doc. 375 at 9-10.
[107] *Id.*

jury returned a verdict of less than half of that award, it cannot say that Avondale was prejudiced by the argument in a manner that would require a new trial. Indeed, the Court instructed the jury that counsels' statements on damages were not evidence, but simply argument. The jury appears to have followed the instruction by independently reaching its own dollar figure for a damages award. Thus, the Court will not grant a new trial on this basis, but will consider remittitur.

### 2. Avondale's alternative motion for remittitur due to an excessive award

In the alternative, Avondale moves for remittitur of the jury's award.[108] Avondale argues that the jury's general damages award is excessive when compared to the typical range of such jury awards in factually similar cases in the relevant jurisdiction – namely, Louisiana.[109] Avondale contends that $6.625 million constitutes an excessive general damages award considering Marcella's advanced age (81 years), underlying health conditions (blood clotting, benign prostatic hypertrophy, coronary artery disease, cerebral vascular accident, diabetes, hypertension, hyperlipidemia, renal failure, and possible dementia), and the limited evidence concerning Marcella's pain and suffering during the three-and-a-half months between his first mesothelioma symptoms and his death.[110] Avondale points out that Dr. Staggs testified that Marcella's chronic medical conditions affected his quality of life and longevity.[111] Avondale also highlights that much of the testimony showed that Marcella's quality of life had markedly declined prior to July 2023, when he first experienced any mesothelioma symptoms.[112] For example, Marcella's wife took over their finances in 2020; his appetite declined and he began losing weight in 2021; and, at a doctor's appointment in 2022, he could not remember his name and was noted to have "progressive

---

[108] R. Docs. 328; 328-1 at 28-36.
[109] R. Doc. 328-1 at 29.
[110] *Id.* at 29-30.
[111] *Id.* at 30.
[112] *Id.* at 30-31.

cognitive/functional decline over the past several years."[113]  As of 2022, Marcella could no longer function independently in any complex areas of daily living – his wife managed his medication, he stopped driving, he did not know his age, and he did not know the year or town he was in when visiting a doctor.[114]  Marcella was diagnosed with mesothelioma after he died.[115]  Avondale reiterates that Plaintiffs "offered scant evidence about what Mr. Marcella actually experienced due to mesothelioma" from the time he first experienced symptoms of the disease, July 3, 2023, until he passed away on October 21, 2023.[116]  Although Avondale acknowledges that while there was testimony about Marcella's discomfort and frustration with not having a diagnosis, there was no detailed testimony, it says, as would support the jury's award.[117]  Avondale states that Plaintiffs discussed hobbies that Marcella once enjoyed and ceased doing years before he experienced any mesothelioma symptoms, but they presented "almost no evidence" regarding "how he actually suffered due to mesothelioma in the last three months of his life."[118]  Avondale further argues that Marcella underwent relatively little medical treatment for mesothelioma – no radiation or chemotherapy – and no evidence of his mesothelioma-related medical bills was introduced at trial, which counsels against a high general damages award.[119]  In sum, Avondale maintains that when compared to other cases involving remittitur – particularly, *Gaddy v. Taylor Seidenbach, Inc.* and *Pete v. Boland Marine & Manufacturing Co.* – the evidence in this case does not support a general damages award of $6.625 million.[120]

---

[113] *Id.* at 30.
[114] *Id.* at 30-31.
[115] *Id.* at 31.
[116] *Id.*
[117] *Id.* at 31-32.
[118] *Id.* at 32.
[119] *Id.* at 35-36.
[120] *Id.* at 32-35.

Plaintiffs argue that remittitur is unwarranted because the jury's general damages award was within 150% of the remitted award in *Pete*, which Plaintiffs say is the most recent, comparable case in the relevant jurisdiction – and thus "sufficiently similar – even though, in their view, it has a "weaker" record on damages.[121]  Plaintiffs contend that Marcella's suffering was described in detail, whereas the description of Pete's pain was "described only generally."[122]  The "detail" of Marcella's pain that Plaintiffs cite consists of excerpts from Marcella's post-July 3 medical visits, coupled with Dr. Staggs's testimony about what Marcella would have likely experienced at those points in time based on the doctor's knowledge of the mesothelioma disease process.[123]  Plaintiffs also contend that *Gaddy* is irrelevant because it predates *Pete* and Gaddy testified that he did not have any pain, whereas "Marcella's suffering was extreme."[124]

Avondale replies, arguing that "Plaintiffs' [o]pposition takes a 30,000-foot view of remittitur and fails to engage with the specific facts of this case, *Pete*, or *Gaddy*."[125]  Avondale asserts that Plaintiffs did not present any evidence of what Marcella actually experienced due to mesothelioma, other than periodic pain and frustration from not having a diagnosis, but rather they relied on Dr. Staggs's testimony about mesothelioma in general.[126]  Avondale reiterates that Plaintiffs testified as to hobbies Marcella ceased years before the disease manifested, but presented little evidence explaining how he actually suffered from mesothelioma in the last three months of his life.[127]  Avondale also argues that the specific facts of *Gaddy* are more comparable to this case than are the facts of *Pete*.[128]  As to *Pete*, Avondale contends that it is not analogous because (1)

---

[121] R. Doc. 358 at 5, 11, 15-18 (quotes at 16).  The Third-Party Defendants do not take a position on Avondale's motion for remittitur.  R. Docs. 354 at 13; 355 at 1 n.1; 359 at 1 n.1.
[122] R. Doc. 358 at 15-18 (quote at 16).
[123] *Id.* at 16-18.
[124] *Id.* at 5, 11, 18-19 (quote at 5).
[125] R. Doc. 375 at 10.
[126] *Id.* at 10, 12.
[127] *Id.* at 12-13.
[128] *Id.* at 12-16.

the plaintiff was alive at the time of trial, and testified as to his own pain and suffering, and (2) the damages award included sums to compensate the plaintiff for future physical pain and suffering, mental pain and suffering, physical disability, and loss of enjoyment of life.[129]  Also, Pete's past damages award spanned 18 months, whereas Marcella was ill with mesothelioma for only three-and-a-half months, and Pete endured arduous medical treatment, such as chemotherapy, that Marcella did not.[130]  Further, in *Pete* there was extensive testimony regarding how mesothelioma affected the plaintiff's quality of life, whereas the record in this case lacks such evidence considering that Marcella was no longer functioning independently in the complex activities of daily living before he experienced his first symptoms of mesothelioma.[131]  Avondale argues that *Gaddy*, on the other hand, is more factually similar to this case because the plaintiff there suffered with mesothelioma for six months prior to death, had a variety of other health conditions that contributed to his loss of enjoyment of life and mental anguish, and underwent less medical treatment than the plaintiff in *Pete*.[132]  Avondale also points out that neither the district court nor the Fifth Circuit discussed the 150% rule in *Gaddy*, suggesting, says Avondale, that the "rule" is not mandatory in fact-specific mesothelioma cases.[133]  Avondale thus contends that this case should be valued "on the lower end of the spectrum presented … in *Gaddy*: $1.5 million."[134]

Under Rule 59(a)(1)(A), a court may "grant a new trial when the jury's award is excessive and against the great weight of the evidence in a manner that suggests bias or prejudice." *Gaddy v. Taylor Seidenbach, Inc.*, 446 F. Supp. 3d 140, 159 (E.D. La.) (citing *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992)), *aff'd sub nom., Adams v. Ethyl Corp.*, 838 F. App'x 822

---

[129] *Id.* at 13.
[130] *Id.*
[131] *Id.* at 13-15.
[132] *Id.* at 15-16.
[133] *Id.* at 16 ("Indeed, no court has applied the 50% enhancement to a mesothelioma case.").
[134] *Id.*

23

(5th Cir. 2020).  If, however, the damages award is "merely excessive or so large as to appear contrary to right reason … remitter, not a new trial," is the appropriate remedy.  *Brunnemann*, 975 F.2d at 178.  "An award is excessive only if it is greater than the maximum amount the trier of fact could properly have awarded."  *Moore v. M/V Angela*, 353 F.3d 376, 384 (5th Cir. 2003).

Courts in the Fifth Circuit utilize a "maximum recovery rule" to determine whether a jury's general damages award is excessive.  *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019). "The inquiry looks to other published decisions from the relevant jurisdiction … involving comparable facts."  *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019).  The "relevant jurisdiction" in this context "is the state providing the substantive law for the claim." *Puga*, 922 F.3d at 297 (quotation omitted).  Although "[p]ast verdicts can provide an objective frame of reference," they do not control, because "[w]hen determining the excessiveness of a jury verdict, courts must review each case on its own facts."  *Id.* (quotations omitted).  The maximum recovery rule allows a verdict that is less than or equal to 150% of the highest inflation-adjusted awards in analogous, published cases from the relevant jurisdiction.  *Longoria*, 932 F.3d at 365, 367.

In *Longoria*, the Fifth Circuit acknowledged that it has been "inconsistent about where in the analysis the [maximum recovery] rule has a role."  *Id.* at 365. The court stated that sometimes the rule had been applied "at the outset to determine whether the damages [were] excessive," and "[o]ther times … the rule [was used] only to determine how much of a reduction [was] warranted after deciding the award [was] excessive."  *Id.*  The difference may matter when state law applies to the substantive claims.  *Id.*  Although the Fifth Circuit recognized that the maximum recovery rule is a useful "guidepost in setting a remitter, which is itself a discretionary act," at step two, it declined to decide whether the rule could be used in step one – determining excessiveness –

24

because, in the case before it, the result was the same under both the rule and the applicable state law (Texas).  *Id.* at 366.  Thus, this Court must examine Louisiana law on remittitur in conjunction with its application of the federal maximum recovery rule.

Under Louisiana law, courts evaluating the excessiveness of a jury's damages award must consider "prior awards in similar cases, as well as the particular facts and circumstances of the case under review."  *Pete v. Boland Marine & Mfg. Co.*, 379 So. 3d 636, 644 (La. 2023).  Then "the court is to … also consider those prior awards to determine the highest or lowest point which is reasonably within [the jury's] discretion."  *Id.* (quotation omitted).  The goal in remitting an award "is not to balance the number of high and low awards and arbitrarily adjust the jury's award to an average of these awards but to determine the highest reasonable award."  *Id.* at 650.

The outcome in this case at step one (the question of excessiveness) is the same under the Louisiana or federal standard.  An examination of the facts and circumstances of this case, coupled with a review of the prior jury awards in comparable cases, leads to the conclusion that the jury's general damages award was excessive.  As Avondale points out, Plaintiffs presented very little evidence at trial of what Marcella actually endured in the three months between his first symptoms of mesothelioma and when he passed away.  Because he was not diagnosed with mesothelioma until after death, the record does not contain a first-hand account of his pain and suffering or mental anguish attributable to the disease.  The record also lacks evidence of Marcella's mesothelioma-related medical bills.  Indeed, he underwent little medical treatment for mesothelioma – no radiation or chemotherapy.  That is not to say that there was no evidence supporting some kind of general damages award.  The record reflects medical appointments at which Marcella presented with complaints consistent with the disease and that he underwent two thoracenteses procedures to relieve fluid buildup from his lungs.  The medical records recount pain reported by Marcella.

These records were supplemented by Dr. Staggs's testimony about the mesothelioma disease process and his assumptions about what Marcella would have experienced at various stages of the disease, including a drowning sensation as a result of the fluid buildup. Plaintiffs – Marcella's wife and children – offered little insight into what Marcella suffered due to mesothelioma during the last three months of his life. They testified as to what Marcella was like as a husband and father. They also discussed hobbies that Marcella enjoyed in his younger years, but had ceased due to other health conditions preexisting his first symptoms of mesothelioma. They did testify that he was frustrated by the lack of a diagnosis for his symptoms. Although this evidence is relevant and supports a damages award, it does not support an award of $6,625,000, especially in light of the other evidence. Marcella was advanced in age (81 years), had underlying health conditions that affected his quality of life long before developing mesothelioma (blood clotting, benign prostatic hypertrophy, coronary artery disease, cerebral vascular accident, diabetes, hypertension, hyperlipidemia, renal failure, and possible dementia), and suffered from mesothelioma for a relatively short time (approximately three months). The record also reflects that, prior to manifesting this disease, Marcella was already unable to function in many tasks of daily living due to his other ailments. For example, Marcella's wife took over their finances in 2020; his appetite declined and he began losing weight in 2021; and, as of 2022, he had shown progressive cognitive and functional decline – his wife managed his medication, he stopped driving, and he could not report basic information (name, age, location) when visiting a doctor. Considering this particular decedent and the particular circumstances of this case, the general damages award is not within the range that a reasonable jury could have appropriately awarded based on the evidence.

26

Awards from both jury and bench trials in comparable cases from Louisiana support the finding that the general damages award in this case was excessive. *See Gaddy*, 446 F. Supp. 3d at 160-62. This Court uses *Gaddy* as its guide. While *Gaddy* is the most factually similar to this case, it cannot serve as a barometer of what a reasonable jury would award because it involved a remitted award.[135] *See Longoria*, 932 F.3d at 367 (explaining that, in analyzing remittitur, the benchmark is jury awards in comparable cases, not awards remitted by a court). Nevertheless, *Gaddy* is instructive because it is factually similar to this case and the district court there undertook a review of the relevant Louisiana jury and bench awards.

Plaintiff Gaddy, like Marcella, died of mesothelioma. *Gaddy*, 446 F. Supp. 3d at 160. Also like Marcella, Gaddy was of advanced age at death (86 years), suffered with the disease for a relatively short time (six months), and had "a variety of afflictions that contributed to his loss of enjoyment of life and mental anguish." *Id.* The record in *Gaddy*, like this case, contained little evidence of Gaddy's pain and suffering, but was supplemented by medical-expert testimony about the disease process. *Id.* In contrast to the record here, Gaddy incurred $250,661.45 in mesothelioma-related medical expenses. *Id.* at 148-49. The jury awarded $7,500,000 in general damages to Gaddy's survivors. *Id.* at 148. The defendant moved for remittitur. *Id.* at 149.

After reviewing the general damages awards in comparable Louisiana cases, particularly, *White v. Entergy Gulf States Louisiana, L.L.C.*, 167 So. 3d 764 (La. App. 2014), the district court in *Gaddy* held that the jury's award of general damages to Gaddy was excessive. *Id.* at 160-61. The *Gaddy* court found *White* to be the most factually similar case from the relevant jurisdiction. *Id.* In *White*, which was tried to the bench without a jury, a Louisiana appellate court upheld the trial court's $3,800,000 general damages award to the survivors of a 79-year-old mesothelioma

---

[135] The Court notes that *Pete* also involves a remitted jury award. *See Pete*, 379 So. 3d at 650.

victim who died a little more than one month after his diagnosis and never complained about pain although "he was frail, suffered from fluid retention and mouth sores, could not chew or eat his food, and lost weight." *Id.* at 161 (citing *White*, 167 So. 3d at 767, 771-72). Given the factual similarities between the two cases, the district court in *Gaddy* noted that the jury's award to Gaddy's survivors was clearly excessive because it was "almost twice the award upheld in *White*." *Id.* at 161. The same holds true here. The jury's award to Plaintiffs was clearly excessive as it was nearly 75% higher than the amount upheld in *White* – which, like *Gaddy*, is a case factually similar to Marcella's.

Plaintiffs advocate that remittitur is unwarranted because, in their view, the jury's general damages award is not excessive when compared to the remitted award in *Pete*. However, *Pete* is not an appropriate comparator. *Pete* had a much stronger record on the plaintiff's pain and suffering. Pete, unlike Marcella, was alive at the time of trial and testified as to how his mesothelioma diagnosis and treatment affected him. *Pete*, 379 So. 3d at 645-46. He explained that the news was "devastating," leading to depression and a decision to keep it to himself for a time because he was worried about how it would affect his wife and children. *Id.* at 646. In contrast, Marcella never knew he had the disease. Pete underwent chemotherapy and other treatments that were "very rough on the body and mind" and caused "nausea, difficulty swallowing, joint pain and weakness, shoulder pain, as well as difficulty sleeping." *Id.* He had a port inserted in his chest to receive treatments. *Id.* Marcella had relatively little treatment related to mesothelioma symptoms and did not undergo chemotherapy. Mesothelioma, not other preexisting ailments, prevented Pete from enjoying his life and aiding his family in the ways he did before the disease manifested. *Id.* at 646-47. There was little evidence of how Marcella's quality of life was diminished by mesothelioma, as opposed to his other preexisting ailments that

28

had greatly affected him prior to July 2023.  In all, Pete lived for two years following his diagnosis and incurred $551,020.70 in mesothelioma-related medical expenses.  *Id.* at 640, 647.  Marcella lived for a little more than three months from the first symptoms of the disease and no evidence of his relatively small medical bills was introduced at trial.  *Pete* is not the most factually similar case to this one.

"Having found that the jury's award was excessive, the Court must now determine the highest amount the jury could have awarded based on the evidence without abusing its discretion." *Gaddy*, 446 F. Supp. 3d at 161.  Again, *Gaddy* serves as a useful guide.  The district court in *Gaddy* surveyed the relevant, factually similar cases from Louisiana and determined that "[m]ost survival actions involving mesothelioma have generated recoveries ranging from $1,500,000.00 to $3,000,000.00," and "the majority of these cases involve more evidence of obvious and extreme pain and suffering."  *Id.* at 162.  The cases reviewed, in addition to *White*, include: *Roberts v. Owens-Corning Fiberglas Corp.*, 878 So. 2d 631 (La. App. 2004) (upholding a $3,000,000 general damages award where the record reflected that the plaintiff suffered "incredible pain" and had a morphine pump that could not control it); *Hennegan v. Cooper/T. Smith Stevedoring Co.*, 837 So. 2d 96 (La. App. 2002) (upholding a $2,500,000 general damages award where the record reflected that the plaintiff took large amounts of pain medication); *Chaisson v. Avondale Indus., Inc.*, 947 So. 2d 171 (La. App. 2006) (upholding a $1,416,580.54 general damages award where the decedent's children testified that her pain was evident from her facial expressions); *Torrejon v. Mobil Oil Co.*, 876 So. 2d 877 (La. App. 2004) (upholding a $1,800,000 general damages award where the victim lost 40 pounds, could not bath himself, developed bed sores, and was prescribed large amounts of medication for great pain); *Terrance v. Dow Chem. Co.*, 971 So. 2d 1058 (La. App. 2007) (upholding as $5,000,000 general damages award to a mesothelioma victim who had

29

terrible pain, numerous hospitalizations, painful procedures, nausea, severe weight loss, and fatigue and used powerful pain medication). *See Gaddy*, 446 F. Supp. 3d at 160-62 (collecting cases). With these cases as a backdrop, the *Gaddy* court again discussed the evidence of Gaddy's pain and found that the evidence "authorize[d] a larger general damage award than the majority of the [surveyed] cases [which generated recoveries in the range of $1.5 to $3 million] but" not one as large as the one in *White* ($3.8 million). *Id.* at 162. The *Gaddy* court then concluded that a general damages award of $3 million was appropriate.

The same analysis pertains here. Marcella reported pain to physicians on a few occasions, and Dr. Staggs used his understanding of the mesothelioma-disease process to explain what Marcella would have been experiencing during those appointments, even if he did not precisely articulate it. Also, photographs of Marcella in his last days depict a feeble and emaciated man. Plaintiffs explained that, although Marcella had largely given up his hobbies by the time he manifested mesothelioma, they noticed a swift decline once the disease's symptoms began. Marcella underwent two thoracenteses procedures to address a particularly distressing medical problem. He was ill with the disease for about three months and had underlying medical conditions that affected his quality of life. These facts are very similar to *Gaddy*. Therefore, this Court finds that an award in line with *Gaddy* – and the cases underlying that decision – is appropriate.

A consideration of *Pete* and the cases cited therein bolsters this conclusion. As previously discussed, *Pete* is factually distinguishable from this case. The remitted general damages award there – $5,000,000 – compensated for two years of physical and mental suffering, the effects of numerous medical procedures, and a marked disease-related decline in the quality of life. *Pete*, 379 So. 3d at 645-47. It also included a future damages award because Pete was alive at the time

30

of trial. *Id.* at 640. A remitted award of $5,000,000 in this case would be unreasonable considering the numerous factual distinctions.

In finding $5,000,000 to be a reasonable award, the *Pete* court primarily relied on *Lege v. Union Carbide Corp.*, 365 So. 3d 617 (La. App. 2021). *See Pete*, 379 So. 3d at 647-48. The appellate court in *Lege*, upheld a $4,000,000 general damages award where the decedent lived for two years following his diagnosis, suffered immense pain, depression, and shortness of breath, had fluid removed from his lungs, underwent unsuccessful chemotherapy, was confined to bed for the last four months of his life, and could not eat or speak. *Id.* These facts were clearly analogous to *Pete*. The *Pete* court, in addition to *White*, reviewed the following cases: *Bagwell v. Union Carbide Corp.*, 364 So. 3d 378 (La. App. 2019) (increasing survival damages award to $1,450,000 where a 57-year-old mesothelioma victim suffered for three years with immense pain and numerous medical procedures, was forced into retirement from an aerospace career, sustained loss of enjoyment of life, and had a greatly diminished life expectancy), *rev'd on other grounds*, 308 So. 3d 289 (La. 2021); *Craft v. Ports Am. Gulfport, Inc.*, 273 So. 3d 517 (La. App. 2019) (refusing to increase a $1,600,000 general damages award where mesothelioma victim testified as to significant impact on enjoyment of life and numerous medical procedures); *Romano v. Metro. Life Ins. Co.*, 221 So. 3d 176 (La. App. 2017) (increasing a $500,000 jury award of general damages to $1,500,000 where plaintiff had numerous invasive surgeries, including partial removal of the lung lining, and suffered for two years); *Williams v. Placid Oil Co.*, 224 So. 3d 1101 (La. App. 2017) (affirming survival damages award of $3,000,000 where wife developed mesothelioma from asbestos on husband's clothes and evidence showed tumors encased her heart); and *Oddo v. Asbestos Corp.*, 173 So. 3d 1192 (La. App. 2015) (affirming survival damages award of $2,301,393.15 for 81-year-old man who died two months after mesothelioma diagnosis). *See Pete*,

31

379, So. 3d at 648-49.  The facts of the case at bar are clearly closer to those on the lower end of the spectrum of these cases than they are to either *Pete* or *Lege.*

Considering the foregoing, and having concluded that the jury's general damages award of $6,625,000 was excessive, the Court must determine the highest award the jury could have rendered.  As noted in *Gaddy*, and confirmed in *Pete*, survival actions involving mesothelioma generate recoveries ranging from $1,500,000 to $5,000,000, with the higher end encompassing cases involving more protracted periods of living with the disease, more medical intervention, and a stronger record of pain and suffering.  After reviewing all of the evidence in the record, especially witness testimony, the Court, applying the maximum recovery rule applicable to claims arising under Louisiana law, concludes that an appropriate award in this case is $3,900,000.  This figure is derived from the $3 million award the *Gaddy* court held to be the highest amount the jury could have properly awarded in that case, after surveying the most comparable published decisions from the relevant jurisdiction and applying the maximum recovery rule, which award was subsequently upheld by the Fifth Circuit.  Using the U.S. Bureau of Labor Statistics' CPI Inflation Calculator,[136] this Court then adjusted this $3 million figure for inflation and rounded the result upwards, yielding $3.9 million as the highest reasonable award for this case.

### C.  Plaintiffs' Rule 59(e) Motion to Alter or Amend Final Judgment (R. Doc. 316)

Plaintiffs move under Rule 59(e) to alter or amend the final judgment to include awards of prejudgment interest at the applicable Louisiana state judicial interest rate from February 8, 2024 (the date of judicial demand), through February 12, 2026 (the date of final judgment), and post-judgment interest based on the standard federal judicial interest rate.[137]  Plaintiffs assert that post-judgment interest is governed by federal law and is automatically awarded as a matter of course

---

[136] *See Longoria*, 932 F.3d at 367 n.6; *Puga*, 922 F.3d at 298 n.12.
[137] R. Doc. 316.

pursuant to 28 U.S.C. § 1961(a).[138]  Plaintiffs argue that Louisiana law applies to the award of prejudgment interest because this Court exercised supplemental jurisdiction over their state-law negligence claims.[139]  They further argue that, under La. R.S. 13:4203, prejudgment interest is mandatory in tort cases brought under Louisiana law.[140]

Avondale does not dispute that post-judgment interest at the federal interest rate should be awarded pursuant to § 1961(a).[141]  But Avondale does take issue with the Plaintiffs' position on prejudgment interest, urging instead that the Court decline to exercise its discretion to award prejudgment interest or, alternatively, award it at the federal interest rate, not the Louisiana rate.[142]  Avondale contends that an award of prejudgment interest is not governed by Louisiana law in this case because this Court exercised neither diversity jurisdiction pursuant to 28 U.S.C. § 1332, nor supplemental jurisdiction pursuant to 28 U.S.C. § 1367, over Plaintiffs' state-law negligence claims.[143]  Instead, Avondale removed this case on the basis of federal-officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).[144]  Thus, says Avondale, federal law, which neither permits nor precludes prejudgment interest, applies and the Court should either decline to award it or award it at the federal interest rate.[145]

Plaintiffs reply, arguing that upon dismissal of Avondale's federal defenses, this Court retained supplemental jurisdiction over Plaintiffs' claims by virtue of § 1367.[146]  Thus, Plaintiffs

---

[138] *Id.* at 1.
[139] R. Doc. 316-1 at 3.
[140] *Id.*
[141] R. Doc. 329 at 1 n.2.
[142] *Id.* at 1.
[143] *Id.* at 1-6.
[144] *Id.* at 2.
[145] *Id.* at 2-6.
[146] R. Doc. 331 at 1-6.

contend that prejudgment interest is governed by state law and is mandatory at the Louisiana rate under La. R.S. 13:4203.[147]

In a surreply, Avondale argues that § 1367 is not applicable in this case.[148]  Instead, Avondale states that § 1442(a)(1) creates a type of ancillary jurisdiction over the nonfederal claims in the case so that those claims remain in federal court even after the dismissal of the federal claims, without reliance on § 1367.[149]  Avondale continues to assert that this means that state law does not apply to the award of prejudgment interest.[150]

As Avondale says, this case was removed to federal court based on federal-officer jurisdiction pursuant § 1442(a)(1).[151]  The notice of removal does not invoke diversity (§ 1332) or supplemental (§ 1367) jurisdiction.[152]  And the Order & Reasons dismissing Avondale's federal defenses makes no mention of § 1367 (or any other law) as the basis for retaining jurisdiction over Plaintiffs' state-law negligence claims.[153]  No party, nor the Court, questioned the retention of jurisdiction.  Indeed, the Fifth Circuit has held that, when a case is removed under § 1442(a)(1), the "elimination of the removable [federal] controversies d[oes] not deprive the court of power to enter judgment" on a state-law claim because "§ 1442(a)(1) creates a species of ancillary jurisdiction over the nonfederal elements of the case." *IMVC Pro. Servs. of Fla., Inc. v. Latin Am. Home Health, Inc.*, 676 F.2d 152, 158 (5th Cir. 1982).  Under this view, this ancillary jurisdiction is not dependent on a party's invocation of § 1367.  *See id.* at 158-59; *see Deroche v. Anco Insuls., Inc.*, 2025 WL 2848059, at *4 (E.D. La. Oct. 8, 2025) (observing that federal jurisdiction over state-law claims was retained under § 1442(a) after the dismissal of federal defenses, without

---

[147] *Id.* at 6-8.
[148] R. Doc. 343 at 1-2.
[149] *Id.* at 2.
[150] *Id.* at 1-4.
[151] R. Doc. 1.
[152] *Id.*
[153] R. Doc. 175.

exercising supplemental jurisdiction under § 1367). Courts have recognized that "'a federal court's r[o]le under § 1442(a) is similar to that of a federal court sitting in diversity.'" *McAllister v. McDermott, Inc.*, 2020 WL 4745743, at *9 (M.D. La. Aug. 14, 2020) (alteration omitted; collecting cases) (quoting *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 517, 577 (4th Cir. 1989)). If this Court were sitting in diversity, prejudgment interest would be governed by Louisiana law and mandatory under La. R.S. 13:4203. *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) ("State law governs the award of prejudgment interest in diversity case."); La. R.S. 13:4203 ("Legal interest shall attach from the date of judicial demand, on all judgments, sounding in damages, 'ex delicto', which may be rendered by any of the courts."). Under this reasoning, the Court finds that it should act as if it were sitting in diversity, and prejudgment interest should be awarded at the Louisiana rate.[154]

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Avondale's motion for judgment notwithstanding the verdict (R. Doc. 324) is DENIED.

IT IS FURTHER ORDERED that Avondale's motion for new trial (R. Doc. 328) is DENIED.

IT IS FURTHER ORDERED that Avondale's motion for remittitur (R. Doc. 328) is GRANTED. The general damage award is remitted to $3,900,000.00. Plaintiffs must file either

---

[154] Alternatively, the *IMVC* court's notion of ancillary jurisdiction discussed in that 1982 case was subsumed within the concept of supplemental jurisdiction upon the adoption of § 1367 in 1990. *Cf. King v. Enter. Leasing Co.,* 2007 WL 840302, at *1 (N.D. Tex. Mar. 20, 2007) (observing that "ancillary" jurisdiction over indemnification claim was subsumed within supplemental jurisdiction by means § 1367). If so, it also follows that "[w]hen state law claims are before a federal court based on supplemental jurisdiction, state law governs the award of prejudgment interest." *5G Studio Collaborative, LLC v. Dall. Uptown Hosp., LLC*, 2017 WL 4750697, at *2 (N.D. Tex. Oct. 20, 2017). Either way, then, state law governs the award of prejudgment interest.

an acceptance of the remittitur or notice of intent to retry the case within 21 days of the issuance of this Order & Reasons.

IT IS FURTHER ORDERED that Plaintiffs' Rule 59(e) motion to alter or amend the final judgment to include prejudgment and post-judgment interest (R. Doc. 316) is GRANTED. Plaintiffs are awarded prejudgment interest at the applicable Louisiana state judicial interest rate from the date of judicial demand (February 8, 2024), through the date of the final judgment (February 12, 2026), along with post-judgment interest at the standard federal judicial rate.

IT IS FURTHER ORDERED that, if Plaintiffs elect to accept the remitted award, the parties must jointly submit to the Court a proposed final judgment within five days of the date of Plaintiffs' notification to the Court of their choice.

New Orleans, Louisiana, this 26th day of May, 2026.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE